[Cite as *State v. Bergstresser*, 2024-Ohio-3299.]

# COURT OF APPEALS OF OHIO

# EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

STATE OF OHIO,                          :

    Plaintiff-Appellee,          :

                                     No. 113269

    v.                           :

DANIEL BERGSTRESSER,                    :

    Defendant-Appellant.         :

---

## JOURNAL ENTRY AND OPINION

**JUDGMENT:**  AFFIRMED IN PART, REVERSED IN PART
                  AND REMANDED
**RELEASED AND JOURNALIZED:**  August 29, 2024

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-21-664605-A

---

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and James D. May, Assistant Prosecuting Attorney, *for appellee*.

Cullen Sweeney, Cuyahoga County Public Defender, and Noelle A. Powell-Sacks, Assistant Public Defender, *for appellant*.

MARY EILEEN KILBANE, P.J.:

**{¶ 1}** Defendant-appellant Daniel Bergstresser ("Bergstresser") appeals from his convictions and sentence for various theft offenses following a jury trial. For the reasons that follow, we affirm.

**Factual and Procedural History**

**{¶ 2}** On October 26, 2021, a Cuyahoga County Grand Jury indicted Bergstresser on one count of telecommunications fraud in violation of R.C. 2913.05(A) with a furthermore clause; one count of theft in office in violation of R.C. 2921.41(A)(1) with a furthermore clause; one count of theft in office in violation of R.C. 2921.41(A)(2) with a furthermore clause; one count of unauthorized use of property in violation of R.C. 2913.04(B); and one count of grand theft in violation of R.C. 2913.02(A)(3). According to the indictment, the property alleged to have been stolen was "$7,500 or more and was less than $150,000." Bergstresser initially pleaded not guilty to all charges, and the case proceeded to a jury trial on August 15, 2023.

**{¶ 3}** At trial, the State called Rachael Bohnett ("Bohnett"), who testified that she worked at MetroHealth in Cleveland, Ohio, as an operating room materials coordinator. Bohnett testified that she was responsible for ordering medical supplies for MetroHealth and explained how the internal and external supply chain operated. Bohnett testified that she worked with Bergstresser, who was also employed as a purchaser, although Bergstresser worked in the heart and vascular unit.

{¶ 4} Bohnett testified that on August 10, 2021, near the end of Bergstresser's employment with MetroHealth, he called in sick, and Bohnett was tasked with covering for him. While doing so, Bohnett testified that she went to the receiving dock to pick up two packages that Bergstresser had ordered. Bohnett testified that according to the packing slips, the packages contained gold eye weights. She further testified that this was unusual, because Bergstresser's department — heart and vascular — did not use gold eye weights. Bohnett testified that she was shocked to see these packages and took the information to her and Bergstresser's supervisor, Donna Barr ("Barr").

{¶ 5} Barr testified that she worked at MetroHealth as the manager of surgical supplies. In this role, she oversaw a staff of 13, including Bohnett and Bergstresser. Barr testified that she usually wore scrubs to work, and her staff always wore scrubs to work. Barr testified that in 2021, Bergstresser was assigned to the heart and vascular unit. Barr described that staff could order supplies either by scanning a bar code or by inputting the information manually into MetroHealth's ordering system. Barr testified that Bergstresser called in sick on August 10, 2021, stating that he had an injured foot that he could not walk on, and Barr assigned Bohnett to cover for him.

{¶ 6} Barr testified that on August 10, 2021, she went through Bergstresser's requisitions to see if there was a purchase order for a specific product because she was concerned that it had not been received. Barr testified that while going through Bergstresser's records, she saw a purchase order for gold eye weights.

Barr testified that this was unusual because gold eye weights are not used in the heart and vascular unit. Barr testified that she went on to see if Bergstresser had placed similar orders in the past and discovered that multiple additional gold weights had been ordered; Barr described this as very unusual and testified that "it set a flag off." Barr testified that she also discovered that the dates on the orders had been changed to 2023, two years in the future; this would have been done manually, and this change would have made it difficult for someone to notice the irregular orders if they were not specifically looking for them. Barr testified that the cost centers were also changed on the orders from heart and vascular to other cost centers; this change also would have been made manually. Further, Barr testified that Bergstresser had signed the delivery tickets for the earlier orders for packages containing gold eye weights.

{¶ 7} Barr testified that because gold is a commodity, the invoices for the gold eye weights included a variable surcharge that changed based on how much the price of gold had changed. Barr testified that the total amount of the gold weights that had been ordered was $17,656 presurcharge, and the total of the surcharge was approximately $1,000.

{¶ 8} Barr also corroborated Bohnett's testimony, explaining that Bohnett came to Barr when she was covering for Bergstresser and informed Barr that she had just picked up gold weights that Bergstresser had ordered and shipped overnight.

{¶ 9} Barr testified that based on the foregoing, she got in touch with MetroHealth human resources and Cleveland police. Based on advice from police detectives and human resources, Barr reached out to Bergstresser and instructed him to come directly to her office the next morning, but Bergstresser blocked her phone number, the two did not have any further communications, and Bergstresser never returned to work.

{¶ 10} Barr went on to testify that additional investigations into Bergstresser's past orders revealed that he had ordered a NovaSure, a device used in gynecological surgery. Barr testified that, like the gold eye weights, the NovaSure was not something that would ever be needed by the heart and vascular unit. Further, the device had a gold tip. Ultimately, Barr testified that between April and August 2021, 26 orders for gold eye weights had been placed by Bergstresser.

{¶ 11} The State called Samantha Oman ("Oman"), who testified that in August 2021 she was employed as a surgical supervisor for materials management at MetroHealth. In this position, Oman worked under Barr and supervised a team of eight to 12 people, including Bergstresser. Oman testified that in September 2021, when she was cleaning out the receiving room adjacent to Bergstresser's workspace, she discovered empty packaging from gold eye weights.

{¶ 12} The State called Gregory Kirby ("Kirby"), who in August 2021 was employed as a shipping and receiving clerk at MetroHealth. Kirby testified that he would see Bergstresser about once a day when Bergstresser would pick up his packages early in the morning. Kirby testified that on August 11, 2021, the day after

Barr discovered that Bergstresser had been ordering gold eye weights, Kirby saw Bergstresser coming in the back door of the receiving dock shortly after 8 a.m. Kirby testified that Bergstresser was wearing a black t-shirt, shorts, and a backwards baseball cap, which was unusual because Bergstresser typically wore scrubs to work. Kirby testified that they said good morning to each other, and Bergstresser appeared to be walking normally. The State introduced a still image from MetroHealth's surveillance footage of the receiving dock, depicting a man dressed as described above, and Kirby testified that the man in the image appeared to be Bergstresser.

{¶ 13} The State also called Jordan Tipton ("Tipton"), who testified that in August 2021 he worked in the receiving dock at MetroHealth's main campus with Kirby. Tipton testified that he worked with Bergstresser because Tipton was responsible for delivering supplies to one of the areas where Bergstresser worked. Tipton testified that in August 2021, he received a text message from Bergstresser asking Tipton not to bring up packages after 11:30 a.m. because Bergstresser would personally pick them up; Tipton testified that this was somewhat unusual.

{¶ 14} The State called Detective Christopher Mealey ("Detective Mealey"), who testified that he was a detective assigned to MetroHealth in 2021. Detective Mealey testified that prior to the incidents described above, he knew Bergstresser from seeing him around the MetroHealth main campus, and in August 2021 he was assigned to investigate this matter. As part of his investigation, Detective Mealey met with Barr about the package of gold eye weights that Bohnett received for Bergstresser. Detective Mealey testified that he also spoke to Bohnett, Oman, Kirby,

and Tipton. Detective Mealey also reviewed the surveillance footage from the receiving dock and the text messages between Bergstresser and Barr.

{¶ 15} At the close of the State's case, Bergstresser's counsel made a Crim.R. 29 motion. The court denied this motion. Bergstresser did not call any witnesses or present any other evidence and renewed the Crim.R. 29 motion, which the court again denied.

{¶ 16} On August 17, 2023, the jury returned a verdict of guilty on all counts. The court referred Bergstresser to the probation department for a presentence investigation ("PSI"). On September 14, 2023, the court held a sentencing hearing. The assistant prosecuting attorney, defense counsel, and Bergstresser addressed the court. Ultimately, the court sentenced Bergstresser to nine months in prison on each count, to be served concurrently. The court also ordered Bergstresser to pay $18,470 in restitution to MetroHealth. Defense counsel objected to the ordered restitution amount, and the court overruled the objection. At the conclusion of the sentencing hearing, the court stated:

> And, by the way, if he's released on an F3 from a state penal institution, he could be on Post Release Control of anywhere of one to three years.

In the corresponding sentencing journal entry, the court stated:

> Pursuant to R.C. 2967.28(F)(4)(C), the defendant will be subject to a period of post-release control of: a mandatory minimum 1 year, up to a maximum of 3 years. The adult parole authority will administer the post-release control pursuant to R.C. 2967.28, and the defendant has been notified that if he violates post-release control, the parole board may impose a prison term as part of the sentence of up to half of the stated prison term or stated minimum term originally imposed upon the defendant in nine-month increments. If while on post-release

control the defendant is convicted of a new felony, the sentencing court will have authority to terminate the post-release control and order a consecutive prison term of up to the greater of twelve months or the remaining period of post-release control.

{¶ 17} On October 16, 2023, Bergstresser filed a timely notice of appeal.

{¶ 18} The briefing in this appeal was completed on May 2, 2024. On June 6, 2024, Bergstresser's appellate counsel filed a notice of Bergstresser's death; Bergstresser passed away on May 23, 2024.

{¶ 19} On June 21, 2024, Bergstresser's appellate counsel filed a motion to waive oral argument, which this court granted. On June 26, 2024, the State filed a motion for substitution of party due to death of appellant pursuant to App.R. 29(A)("the substitution motion"). On July 1, 2024, Bergstresser's appellate counsel filed a brief in opposition to the State's substitution motion. On July 10, 2024, this court granted the State's substitution motion and substituted Bergstresser's counsel of record as a party, pursuant to *State v. Grossman*, 2024-Ohio-2363, ¶ 17 (8th Dist.), citing *State v. McGettrick*, 31 Ohio St.3d 138, 139 (1987).

{¶ 20} In *McGettrick*, the Ohio Supreme Court sought to balance the interests of both criminal defendants and the citizens of the State of Ohio. In holding that App.R. 29(A) provides that a party may make a motion for substitution of a party when an appellant dies while their direct appeal is pending, the Ohio Supreme Court noted that "[i]t is in the interest of the defendant, the defendant's estate and society that any challenge initiated by a defendant to the regularity of a criminal proceeding be fully reviewed and decided by the appellate process." *McGettrick* at

141, citing *Commonwealth v. Walker*, 447 Pa. 146, 148 (1972), and *State v. Jones*, 220 Kan. 136 (1976). Thus, to the extent that Bergstresser's arguments in the instant appeal are not mooted by his death, as further discussed below, we will address them on their merits.

{¶ 21} Bergstresser presents four assignments of error for our review:

I. Mr. Bergstresser's convictions are based on evidence that is insufficient to prove all necessary elements of the offenses beyond reasonable doubt.

II. The trial court erred when it failed to hold a statutorily mandated evidentiary restitution hearing when Mr. Bergstresser's counsel objected to the restitution amount ordered at sentencing.

III. The trial court erred when it failed to merge all or some of the counts of which Mr. Bergstresser was convicted.

IV. The trial court erred in sentencing Mr. Bergstresser to one- to three-years post-release control without the proper advisements and it erred in its sentencing journal entry which erroneously states [that] Mr. Bergstresser's post-release control is mandatory.

**Law and Analysis**

**I. Sufficiency of the Evidence**

{¶ 22} In Bergstresser's first assignment of error, he argues that his convictions were not supported by sufficient evidence. Specifically, Bergstresser argues that the State did not prove that Bergstresser stole the medical supplies, it merely presented evidence that someone using Bergstresser's identification number ordered gold eye weights. Bergstresser argues that his convictions were improperly based on stacked inferences.

{¶ 23} An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is "to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." *State v. Noah*, 2022-Ohio-1315, ¶ 7 (8th Dist.), citing *State v. Murphy*, 2001-Ohio-112, 543. "'The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'" *Id.*, quoting *State v. Walker*, 2016-Ohio-829, ¶ 12, quoting *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus. Essentially, the test for sufficiency requires determining whether the prosecution met its burden of production at trial. *Id.*, citing *State v. Bowden*, 2009-Ohio-3598, ¶ 12 (8th Dist.).

{¶ 24} Each of the offenses of which Bergstresser was convicted involved theft. Count 1, telecommunications fraud, alleged that Bergstresser, in violation of R.C. 2913.05(A),

> having devised a scheme to defraud, did knowingly disseminate, transmit, or cause to disseminated or transmitted by means of wire, radio, satellite, telecommunication, telecommunications device, or telecommunications services any writing, data, sign, signal, picture, sound, image with purpose to execute or otherwise further the scheme to defraud.

Count 1 also included a furthermore clause that Bergstresser committed a violation of division (A) of Section 2913.05 of the Revised Code, and this violation occurred as part of a course of conduct involving other violations of division (A) of Section

2913.05 of the Revised Code, or violations of section 2913.02, 2913.04, 2913.11, 2913.21, 2913.31, 2913.42, 2913.43, or 2921.13 of the Revised Code, and the value of the benefit obtained by the offender or of the detriment to the victim of fraud is seven thousand five hundred dollars or more but less than one hundred fifty thousand dollars.

{¶ 25} Count 2, theft in office in violation of R.C. 2921.41(A)(1), alleged that Bergstresser did,

> while being a public or party official, commit a theft offense, as defined in division (K) of section 2913.01 of the Revised Code, when the offender used the offender's office in aid of committing the offense or permitted or assented to its use in aid of committing the offense and the value of property or services stolen was [between $7,500 and $150,000.]

{¶ 26} Count 3, theft in office in violation of R.C. 2921.41(A)(2), alleged that Bergstresser did,

> while being a public or party official, commit a theft offense, as defined in division (K) of section 2913.01 of the Revised Code, when the property or service involved is owned by this state, any other state, the United States, a county, a municipal corporation, a township, or any political subdivision, department, or agency of any of them, or is owned by a political party, or is part of a political campaign fund and the value of property or services stolen was [between $7,500 and $150,000.]

{¶ 27} Count 4, unauthorized use of property in violation of R.C. 2913.04(B), alleged that Bergstresser did,

> in any manner and by any means, including but not limited to, computer hacking, knowingly gain access to, attempt to gain access to, or cause access to be gained to any computer, computer system, computer network, cable service, cable system, telecommunications device, telecommunications service, or information service without the consent of, or beyond the scope of the express or implied consent of, the owner of the computer, computer system, cable service, cable

system, telecommunications device, telecommunications service, or information service or other person authorized to give consent and unauthorized use of computer, cable, or telecommunications property is committed for the purpose of devising or executing a scheme to defraud or to obtain property or services, for obtaining money, property, or services by false of fraudulent pretenses, or for committing any other criminal offense and the value of the property or services involved or the loss to the victim is [between $7,500 and $150,000.]

{¶ 28} Finally, Count 5, grand theft in violation of R.C. 2913.02(A)(3), alleged that Bergstresser

did with purpose to deprive the owner, MetroHealth Medical Center, of gold eyelid implant weights and/or Olympus plasma loops and/or Novasure device kits and/or Myosure Reach tissue removal kits or services, knowingly obtain or exert control over either the property or services by deception and the property or services stolen is valued at [between $7,500 and $150,000.]

{¶ 29} Here, the evidence presented established that Bergstresser used his position as a purchaser for MetroHealth, a county hospital, to order valuable medical supplies that were not needed for his unit. While Bergstresser argues that the State did not show that Bergstresser ever possessed the gold eye weights in question, this is not strictly necessary for any of the aforementioned offenses. It is sufficient that Bergstresser's unique identification number was employed to order the supplies through MetroHealth's ordering system and his name and signature appeared on the delivery tickets. Additional evidence, including the fact that the orders were made with manually manipulated dates and cost centers, and Bergstresser's attempts to intercept packages from his coworkers, further supports the jury's guilty verdicts.

{¶ 30} Bergstresser also argues that the State did not present sufficient evidence that MetroHealth was actually deprived of the property in question because with the exception of the package intercepted by Bohnett, the gold eye weights were never located, and no evidence was presented that MetroHealth actually paid for the supplies. We reiterate that it is not necessary for any of the aforementioned offenses that the property be located or possessed by Bergstresser. Further, ample evidence was introduced regarding MetroHealth's supply chain, and based on this evidence, the act of ordering and receiving medical supplies on behalf of MetroHealth is sufficient to show that MetroHealth paid for the supplies.

{¶ 31} Viewing all of the evidence in the light most favorable to the State, any rational trier of fact could have found the elements of Bergstresser's offenses proven beyond a reasonable doubt. Therefore, we overrule Bergstresser's first assignment of error.

## II. Restitution Hearing

{¶ 32} In Bergstresser's second assignment of error, he argues that the trial court erred when it failed to hold an evidentiary hearing on restitution, because it was statutorily required to do so when Bergstresser's counsel objected to the amount of restitution at the sentencing hearing. Bergstresser argues that if a party disputes the restitution amount, the court is required to hold an evidentiary hearing.

{¶ 33} As an initial matter, we note that the Ohio Supreme Court has recognized that in some cases, the estate of a convicted criminal who dies before his direct appeal is finished may have a pecuniary interest in the outcome of the appeal

due to the estate's potential liability for financial sanctions or costs imposed on the defendant. *McGettrick*, 31 Ohio St.3d at 141. Therefore, Bergstresser's second assignment of error, despite challenging an aspect of his sentence, is not moot despite the fact that he died while this appeal was pending.

{¶ 34} R.C. 2929.18(A)(1) provides for restitution by the offender to the victim or the victim's estate, and provides in relevant part:

> In open court, the court shall order that full restitution be made to the victim, to the adult probation department that serves the county on behalf of the victim, to the clerk of courts, or to another agency designated by the court. At sentencing, the court shall determine the amount of restitution to be made by the offender. The victim, the victim's representative, the victim's attorney, if applicable, the prosecutor or the prosecutor's designee, and the offender may provide information relevant to the determination of the amount of restitution. The amount the court orders as restitution shall not exceed the amount of the economic loss suffered by the victim as a direct and proximate result of the commission of the offense....The court shall hold a hearing on restitution if the offender, victim, victim's representative, or victim's estate disputes the amount. The court shall determine the amount of full restitution by a preponderance of the evidence.

{¶ 35} The State contends that because Bergstresser did not actually object to the amount of restitution ordered, the court was not required to hold a hearing. The following exchange took place at sentencing:

> DEFENSE COUNSEL: Your Honor....I would also just like to note for the record an objection to the ordered restitution amount.
>
> THE COURT: What's the objection?
>
> DEFENSE COUNSEL: Your Honor, at trial I know that the State of Ohio presented invoices from the various gold eye weight plate implants.

We didn't see anything from their accounts receivable or anything to show that they actually paid for those items, and so that would be the basis for our objection.

I don't object to how it was calculated based on the invoices and the surcharge of the gold, but I don't think they demonstrated an actual lost amount.

We haven't seen anything in that regard, so I would note an objection for the record.

{¶ 36} While the State is correct that trial counsel did not object to how the amount of restitution was calculated, it did object to the amount of economic loss suffered by the victim, MetroHealth. Further, if the State were able to produce evidence showing a higher or lower economic loss incurred by MetroHealth, this would change the amount of restitution ordered by the court. Therefore, because Bergstresser objected to the amount of restitution ordered, the court was required to hold an evidentiary hearing. *State v. Davis*, 2023-Ohio-3064, ¶ 8 (8th Dist.). Bergstresser's second assignment of error is sustained, and the case is remanded for the court to hold a hearing on restitution.

## III. Merger

{¶ 37} In Bergstresser's third assignment of error, he argues that the trial court erred in failing to merge all or some of the counts for which Bergstresser was convicted. Specifically, Bergstresser argues that because all five offenses stem from the same action — the theft of gold eye weights — the offenses should have merged.

{¶ 38} Generally, we review de novo whether certain offenses should be merged as allied offenses under R.C. 2941.25. *State v. Bailey*, 2022-Ohio-4407, ¶ 6, citing *State v. Williams*, 2012-Ohio-5699, ¶ 1. However, because Bergstresser failed

to preserve the issue of merger at trial by objecting, we review the issue for plain error. *Id.*, citing *State v. Rogers*, 2015-Ohio-2459, ¶ 28 ("The failure to raise the allied offense issue at the time of sentencing forfeits all but plain error.").

{¶ 39} Under the plain-error doctrine, intervention by a reviewing court is warranted only under exceptional circumstances to prevent injustice. *Id.*, citing *State v. Long*, 53 Ohio St.2d 91 (1978), paragraph three of the syllabus ("Notice of plain error . . . is to be taken with the utmost caution, under exceptional circumstances and only to prevent a miscarriage of justice."). To prevail under plain error, Bergstresser must establish that "'an error occurred, that the error was obvious, and that there is "a reasonable *probability* that the error resulted in prejudice," meaning that the error affected the outcome of the trial.'" *Id.* at ¶ 8, quoting *State v. McAlpin*, 2022-Ohio-1567, ¶ 66, quoting *Rogers* at ¶ 22 (emphasis added in *Rogers*).

{¶ 40} R.C. 2941.25(A) prohibits multiple convictions for allied offenses of similar import. Courts apply a three-part test under R.C. 2941.25 to determine whether a defendant can be convicted of multiple offenses:

> As a practical matter, when determining whether offenses are allied offenses of similar import within the meaning of R.C. 2941.25, courts must ask three questions when defendant's conduct supports multiple offenses: (1) Were the offenses dissimilar in import or significance? (2) Were they committed separately? And (3) Were they committed with separate animus or motivation? An affirmative answer to any of the above will permit separate convictions. The conduct, the animus, and the import must all be considered.

*Bailey* at ¶ 10, quoting *State v. Earley*, 2015-Ohio-4615, ¶ 12, quoting *State v. Ruff*, 2015-Ohio-995, ¶ 31.

{¶ 41} While Bergstresser is correct that each of his five offenses is predicated on the theft of medical supplies, it was not plain error for the court to sentence Bergstresser separately for each offense. Specifically, while the harm done by Count 5, grand theft, was the deprivation of property from MetroHealth, the harm done by other offenses included Bergstresser's abuse of his position at a public hospital and his misuse of MetroHealth's ordering system. Therefore, we cannot conclude that it was plain error for the court to decline to merge some or all of Bergstresser's offenses. Bergstresser's third assignment of error is overruled.

## IV. Postrelease Control

{¶ 42} In Bergstresser's fourth and final assignment of error, he argues that the trial court erred when it sentenced him to postrelease control without first making the proper advisements. While, as discussed above, this court granted the State's substitution motion and proceeded with the appeal following Bergstresser's death, we decline to consider Bergstresser's fourth assignment of error. Bergstresser has died and therefore is no longer subject to punishment or deterrence through the criminal justice system. *State v. Matthews*, 2019-Ohio-3018, ¶ 11, fn. 2 (6th Dist.), citing *State v. Cupp*, 2018-Ohio-5211, ¶ 29. Further, Crim.R. 43 provides that a defendant must be physically present at every stage of the criminal proceeding and trial. Therefore, the trial court's alleged failure to properly advise Bergstresser of postrelease control in this case is moot.

{¶ 43} Judgment affirmed in part, reversed in part, and remanded for limited proceedings consistent with this opinion.

It is ordered that appellant recover from appellee costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____

MARY EILEEN KILBANE, PRESIDING JUDGE

LISA B. FORBES, J., and
MICHAEL JOHN RYAN, J., CONCUR